IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| EMMA CHENEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-3426-CV-S-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Emma Cheney seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff does not suffer from a severe impairment, and (2) improperly determining plaintiff's residual functional capacity. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.     BACKGROUND

On April 10, 2009, plaintiff applied for disability benefits alleging that she had been disabled since December 15, 2006. Plaintiff's disability stems from myelomalacia (softening of the spinal cord), osteophytes (bone spurs) in her cervical spine, short term memory loss, high blood pressure, high cholesterol, and depression. Plaintiff's application was denied on May 28, 2009. On November 9, 2010, a hearing was held before Administrative Law Judge Linda Carter. On December 2, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 2, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less

2

than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

IV.    *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Terri D. Crawford in addition to documentary evidence admitted at the hearing.

## A.     EARNINGS RECORD

The record shows that plaintiff earned the following income from 1965 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1965 | $ 249.49 | 1988 | $ 7,114.11 |
| 1966 | 0.00 | 1989 | 5,660.08 |
| 1967 | 1,047.01 | 1990 | 7,416.85 |
| 1968 | 1,702.51 | 1991 | 6,772.42 |
| 1969 | 267.68 | 1992 | 797.13 |
| 1970 | 2,738.26 | 1993 | 0.00 |
| 1971 | 216.25 | 1994 | 0.00 |
| 1972 | 0.00 | 1995 | 2,832.00 |
| 1973 | 0.00 | 1996 | 5,664.42 |
| 1974 | 0.00 | 1997 | 4,784.65 |
| 1975 | 0.00 | 1998 | 5,065.00 |
| 1976 | 0.00 | 1999 | 4,752.38 |
| 1977 | 0.00 | 2000 | 3,862.45 |
| 1978 | 0.00 | 2001 | 6,560.46 |
| 1979 | 0.00 | 2002 | 4,628.00 |
| 1980 | 0.00 | 2003 | 0.00 |
| 1981 | 0.00 | 2004 | 0.00 |
| 1982 | 0.00 | 2005 | 0.00 |
| 1983 | 0.00 | 2006 | 424.50 |
| 1984 | 1,050.58 | 2007 | 0.00 |
| 1985 | 0.00 | 2008 | 0.00 |
| 1986 | 226.00 | 2009 | 0.00 |
| 1987 | 5,187.00 | 2010 | 0.00 |

(Tr. at 164).

## B.     SUMMARY OF MEDICAL RECORDS

On April 20, 2005, plaintiff saw Dr. Michael Ball at Ozark Family Health Care (Tr. at 210). She reported pain in her neck, shoulder and back. This was three days after a motor vehicle accident. Plaintiff said she had taken ibuprofen but it was not helping the pain. Dr.

4

Ball prescribed Mobic (a non-steriodal anti-inflammatory), Skelaxin (a muscle relaxer), and Vicodin (a narcotic pain reliever).

On April 27, 2005, plaintiff returned to Dr. Ball for a follow up and reported that she was still sore (Tr. at 210). Dr. Ball ordered a magnetic resonance imaging (MRI) scan of her neck which showed disc protrusion with accompanying bone spurs at several levels (Tr. at 252-253). There was also some softening of her spinal cord at two levels (Tr. at 253).

Dr. Ball discussed the MRI findings with plaintiff at a follow-up appointment on May 13, 2005 (Tr. at 209). She reported she was "doing about the same." Dr. Ball diagnosed cervical pain and refilled her Mobic, Skelaxin and Vicodin.

Plaintiff did not return to Ozark Family Health Care (Tr. at 233). More than a year later, on June 15, 2006, plaintiff saw Mindy Kendrick, APRN, at Doctor's Hospital of Springfield, to establish care (Tr. at 223-224). She reported that she had fallen and hurt her right arm, and her fingertips had been numb for the past two weeks. She also reported dizziness. She was smoking one pack of cigarettes per day. An x-ray of her right arm was negative. She had a mass on her right elbow that she said had been there for a couple of years. Her musculoskeletal/extremities exam was normal including range of motion, she was neurologically intact, and her psychiatric exam was normal. Her sensation, strength, and gait were normal. An MRI of her brain and neck was recommended. She was assessed with cervical radiculopathy, dizziness (vertigo was suspected), right elbow mass, and elevated blood pressure. She was given a prescription for Meclizine (treats nausea associated with motion sickness) and Celebrex (non-steroidal anti-inflammatory).

Two months later, on August 14, 2006, plaintiff returned to see Ms. Kendrick for blood work (Tr. at 221-222). She said she had not had the MRI of her cervical spine and brain done. She said she saw an orthopedist about her right elbow but was going to put off doing anything "until September." Plaintiff denied any symptoms (including dizziness) except

5

elevated blood pressure, and she said she had an appointment on September 5, 2006, for her elbow. No musculoskeletal exam was done, and no musculoskeletal complaints were made. Plaintiff was assessed with right elbow mass, hypertension, and cervical radiculopathy. She was prescribed metoprolol for hypertension.

December 16, 2006, is plaintiff's alleged onset date. The following record printed in blue represents plaintiff's medical care from her alleged onset date until her last insured date.

On April 13, 2007, seven months after her last medical appointment, plaintiff went to Doctor's Hospital for a follow up and for medication refills (Tr. at 219-220). She continued to smoke one pack of cigarettes per day. She denied chest pain, shortness of breath, any respiratory symptoms or any gastrointestinal symptoms. Her mental and physical exams were normal except for the mass on her right elbow. She was assessed with hypertension, hyperlipidemia (high cholesterol), and right elbow mass. She was told to keep taking her blood pressure medicine and add an aspirin a day. She was referred to Dr. Rotton; however, there are no records from Dr. Rotton in this file.

December 31, 2007, is plaintiff's last insured date.

On April 10, 2008, one year after her last medical appointment, plaintiff returned to Ozarks Community Hospital, formerly Doctor's Hospital, for another medication refill (Tr. at 217-218). Plaintiff complained of osteoarthritis pain at multiple sites from her degenerative disc disease and said that Ibuprofen had not been working. She also complained of fatigue. There were no complaints of numbness or dizziness. The nurse practitioner assessed back pain (degenerative disc disease), neck pain, hypertension and hyperlipidemia. She prescribed Darvocet (narcotic) for pain and refilled plaintiff's metoprolol for hypertension. Plaintiff was instructed to follow up in one month.

Four months later, on August 5, 2008, plaintiff returned to Ozarks Community Hospital for fasting lab work (Tr. at 216). She was assessed with hypertension and

hyperlipidemia. There were no complaints or findings related to any pain, numbness or dizziness.

Four months later, on December 8, 2008, plaintiff returned to Ozarks Community Hospital for a flu shot (Tr. at 215). She complained only of coughing and congestion. Plaintiff was assessed with bronchitis, elevated cholesterol, nicotine addiction and hypertension.

On April 10, 2009, plaintiff filed her application for disability benefits.

On May 28, 2009, Kenneth Burstin, Ph.D., a non-examining state agency psychologist, completed a Psychiatric Review Technique (Tr. at 235-245). He found that plaintiff had no medically determinable mental impairment. In support of his findings, he wrote:

> This 58-year-old claimant has alleged disability due to Myelomalacia, osteophytes, short term memory loss, high blood pressure, high cholesterol, and depression. AOD [alleged onset date] is 12/15/06 with DLI [date last insured] of 12/31/07 for this DIB (only) claim.
>
> Medical evidence has been collected for the relevant time period and does not establish a mental impairment and where noted, psych status was noted to have been normal. Records do not establish an MDI [medically determinable impairment], much less a disabling impairment, for the time period under consideration. However, an insufficient-evidence determination is being made, as one of her reported sources indicated that there were no records available for time period in question, at odds with claimant's report of being treated in 2006 by this source.

On July 9, 2009, seven months after her last medical appointment, plaintiff was seen at Ozarks Community Hospital for fasting labs (Tr. at 265). Plaintiff reported that she was having trouble getting to sleep and staying asleep and that she was tired all the time. She said her partner has restless leg syndrome. Plaintiff reported a history of chronic neck pain and requested an MRI. Ms. Kendrick observed that plaintiff's gait was steady, she had no peripheral edema, her heart was normal, her lungs were normal, she was alert and oriented times three and dressed appropriately. Plaintiff continued to smoke. Ms. Kendrick assessed hypertension, fatigue, chronic neck pain, and hyperlipidemia. She ordered blood work and

told plaintiff to follow up in one to two weeks to go over the lab results and discuss plaintiff's neck pain. "Consider MRI."

A chest x-ray was taken on July 9, 2009 (Tr. at 267). Carl Reiger, M.D., reviewed the films and assessed obstructive pulmonary disease,[1] and a small pulmonary nodule.[2]

On July 16, 2009, plaintiff returned to Ozarks Community Hospital for a CT scan of the chest due to the small pulmonary nodule found on her x-ray (Tr. at 266). Aortic and coronary atherosclerosis[3] was observed. Plaintiff was scheduled for a stress test due to the atherosclerosis, her history of hypertension and hyperlipidemia, and the fact that she was still a smoker.

On August 6, 2009, plaintiff was seen by James Rice, M.D., a cardiologist, who noted that plaintiff had had an abnormal stress test (Tr. at 260-262). "Patient denies pain relating to the reason for this office visit." Plaintiff's stress test shows probable inferior ischemia[4] and an ejection fraction of 70%.[5] Dr. Rice noted plaintiff's fibrotic changes in both lungs. "She states that she has not been very active. She states that she cannot walk very far because of

---

[1]Airflow during exhaling is blocked making it increasingly difficulty to breathe.

[2]A solitary pulmonary nodule is a round or oval spot (lesion) in the lungs that is seen with a chest x-ray or CT scan. More than half of all solitary pulmonary nodules are noncancerous (benign). Benign nodules have many causes, including old scars and infections. Infectious granulomas (reactions to a past infection) cause most benign lesions.

[3]Hardening of the arteries caused by plaque build up.

[4]Inferior ischemia means loss of blood supply to the inferior wall of the left ventricle.

[5]During each heartbeat cycle, the heart contracts and relaxes. When the heart contracts, it ejects blood from the two pumping chambers (ventricles). When the heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it does not empty all of the blood out of a ventricle. The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. Because the left ventricle is the heart's main pumping chamber, ejection fraction is usually measured only in the left ventricle (LV). A normal LV ejection fraction is 55 to 70 percent.

knee pain. She occasionally drinks alcohol but denies excessive use." Plaintiff continued to smoke about a pack of cigarettes per day. Plaintiff denied malaise, fatigue, frequent headaches, visual changes, blurred vision, double vision, vision loss, hearing loss, dyspnea (shortness of breath), arthralgias (joint pain), myalgias (muscle pain), muscle cramps, chronic back pain, and chronic neck pain. She denied vertigo, impaired memory, difficulty speaking, depression, and insomnia. Plaintiff's exam was normal. Dr. Rice observed that plaintiff had normal muscle strength bilaterally and normal affect, answering all questions appropriately; and she was alert and oriented times three. He assessed abnormal stress test, unstable angina (chest pain), hypercholesterolemia, hypertension, and tobacco abuse. He scheduled her for an angiogram and an echocardiogram and told her to take an aspirin a day. He prescribed Lovastatin (reduces cholesterol) and metoprolol (for hypertension).

On August 6, 2009, plaintiff had an echocardiogram (Tr. at 257-258). Plaintiff had a mildly dilated left atrium, but her estimated left ventricle ejection fraction was normal at 60% (see footnote 5) and the rest of the test was normal.

On September 9, 2009, plaintiff was seen by Josh Borgstadt, a physician's assistant in the cardiology unit at Ferrell-Duncan Clinic (Tr. at 255-256). Mr. Borgstadt noted that plaintiff had had an angiography which showed a blocked right coronary artery. "It was thought to be best treated medically. She is doing well and feeling much better. She is not having any exertional symptoms." Plaintiff's exam was normal. Mr. Borgstadt assessed coronary artery disease, recommended regular exercise with walking and a low-cholesterol diet, and told her to return in six months for a follow up. He prescribed simvastatin (to reduce cholesterol), aspirin (as a blood thinner), nitroglycerin (as needed for chest pain), and metoprolol (for hypertension).

On October 1, 2009, plaintiff returned to Ozarks Community Hospital for lab work and a flu shot (Tr. at 264). The examiner observed that plaintiff's heart rate and rhythm were

9

normal, her lungs were clear to auscultation, she was alert and oriented times three, and she was well dressed. She continued to smoke a half a pack of cigarettes per day and had not taken her Metformin that day. She was assessed with coronary artery disease, hypertension and hyperlipidemia. She received a flu shot, was told to start taking Metformin, was prescribed metoprolol for hypertension and simvastatin for elevated cholesterol, was told to stop smoking and engage in a healthy lifestyle.

Seven months later, plaintiff went to the cardiology unit at Ferrell-Duncan Clinic and saw Josh Borgstadt, PA, to discuss paperwork for her disability claim (Tr. at 274-275). "She is here to fill out paperwork for disability. She didn't take her medications today so her BP [blood pressure] is high. She denies chest pains but has shortness of breath." Plaintiff's exam was normal. She was assessed with hypertension, hypercholesterolemia, and coronary artery disease. She was told to continue the present plan of care which included simvastatin, metoprolol, aspirin, metformin, and nitroglycerin as needed. "Discussed dietary habits and encouraged healthy eating patterns. . . . Discussed current exercise routine and benefits of regular exercise. . . . Assessed current cardiac risk factors and discussed options to decrease risk. Discussed benefits of heart healthy diet and regular exercise. Discussed options to maximize control of lipids [fat in the blood, such as cholesterol]. Discussed importance of optimal blood pressure control and methods to achieve."

On May 14, 2010, nine months after his only visit with plaintiff, Dr. Rice completed a Medical Source Statement - Physical checklist (Tr. at 269-270). He found that plaintiff could lift five pounds, stand or walk for 15 minutes at a time and less than one hour per day, sit for 15 minutes at a time and for less than one hour per day, that she could not push or pull "to [sic] much weight". He found that she could never climb, balance, stoop, kneel, crouch, crawl, or finger. He found that she could occasionally reach, handle, and feel. She could never speak. She could never hear. She could only occasionally see. There was nothing that

10

she could do frequently. He found that she should avoid any exposure to extreme cold, extreme heat, dust, fumes, hazards and heights. He found that she should avoid moderate exposure to weather, wetness, humidity, and vibration. He found that she needs to lie down three times a day but failed to indicate for how long each time. He indicated that he did not know whether her medication caused any side effects or any decrease in concentration, persistence or pace. The final typed line of the form says, "Does this Medical Source Statement describe limitations that have prevented the client from being able to sustain full time employment prior to 12/31/2007?" and he wrote, "yes" (Tr. at 270). However, Dr. Rice never saw plaintiff prior to December 31, 2007 -- his only visit with plaintiff occurred on August 6, 2009.

On July 1, 2010, nine months after her last visit to Ozarks Community Hospital, plaintiff returned for updated lab work with Ms. Kendrick (Tr. at 272). She reported some symptoms of depression and anxiety. She denied chest pain and shortness of breath. There were no reported pain symptoms. Her exam was normal, including her heart and lungs. She was assessed with depression, anxiety, hypertension, hyperlipidemia and tobacco abuse. She was given prescriptions for Celexa (treats depression) and Vistaril (treats anxiety).

On October 5, 2010, plaintiff returned to see Ms. Kendrick for lab work and to receive a flu shot (Tr. at 277). Plaintiff denied chest pain and unusual shortness of breath. Plaintiff's heart and lungs were normal and she was alert and oriented times three. She continued to smoke a pack of cigarettes per day. She was assessed with chronic obstructive pulmonary disease, tobacco abuse, and vitamin D deficiency. "Discussed smoking cessation. Patient not ready to quit."

On October 10, 2010, plaintiff saw Dr. Rice at Ferrell-Duncan Clinic for a follow up (Tr. at 280-283). Plaintiff denied any chest pain other than one episode of a burning sensation. "She has no exertional pain." She reported some mild shortness of breath, but

11

continued to smoke. Plaintiff denied malaise, fatigue, and dyspnea on exertion. Her exam was

normal. Plaintiff was assessed with tobacco abuse, hypertension, hypercholesterolemia,

coronary artery atherosclerosis. "We informed her of the risks of tobacco abuse. She needs to

quit smoking." Her hypertension was listed as well controlled. "We offered her Chantix[6]

however she declined this and she is going to try patches."

C. SUMMARY OF TESTIMONY

During the November 9, 2010, hearing, plaintiff testified; and Terri D. Crawford, a

vocational expert, testified at the request of the ALJ.

1. Plaintiff's testimony.

At the time of the hearing, plaintiff was 60 years of age and is currently 62 (Tr. at 31).

Plaintiff went to school through 8th grade but subsequently earned a GED (Tr. at 31). She is

5'3" tall and weighs 158 pounds (Tr. at 31). Plaintiff lived in an apartment with her boy

friend (Tr. at 39-40).

Plaintiff was injured in a car accident on April 15, 2005 (Tr. at 33). Since the accident

plaintiff has had a lot of problems with her neck, lower back, and right hip (Tr. at 33).

Plaintiff went to Dr. Ball who did an MRI and said no surgery or physical therapy would do

any good and it was going to be something she would have to learn to live with, that it would

continue to get worse (Tr. at 33-34). Since then it has gotten worse (Tr. at 34). Plaintiff's

neck did not used to hurt all the time, but now it does (Tr. at 34). Plaintiff has pain in her

neck, her lower back, her right hip, her hands and her wrists (Tr. at 34). Plaintiff's neck pain

is a 9 on a scale of 1 to 10 (Tr. at 34). On December 31, 2007, plaintiff's neck pain was not

quite as bad (Tr. at 34). Plaintiff's right hip pain started about four years earlier (Tr. at 35).

Plaintiff wrist and hand pain is about an 8 on a scale of 1 to 10 (Tr. at 37). Her pain was not

quite that bad before December 31, 2007 (Tr. at 37). Her hand and wrist pain was probably

---

[6]A medication to assist with smoking cessation.

12

a six back in 2007 (Tr. at 38). She did have problems lifting things in 2007 because her wrists would give out (Tr. at 38).

Plaintiff suffers from shoulder pain associated with her injury, and sometimes she cannot lift her arms over her head (Tr. at 38). Sometimes she cannot even put a shirt on (Tr. at 38). Her pain is worse in her right shoulder and hand, which is her dominant hand (Tr. at 38). Plaintiff has a mass on her elbow that, at the time of the hearing, was "getting to where it's causing pain" (Tr. at 39).

Plaintiff has not had treatment for her neck or back since 2005 because she was unable to make her appointment for an MRI and "just [has]n't gotten another one done yet." (Tr. at 42-43). Plaintiff has asked her doctor to set one up, but she has not done it yet (Tr. at 43). Plaintiff has insurance through the VA but a lot of doctors do not take it so she has had difficulty receiving treatment in the past (Tr. at 43). Plaintiff was treated with Celebrex in 2005 for pain in her right arm; however, plaintiff has never sought any pain medication for her neck (Tr. at 44). "I like to keep my brain intact and it just numbs the brain, it don't heal the problem." (Tr. at 44). Because plaintiff's doctor told her that taking pain medications was her only treatment option and she does not personally care for pain medication, she did not seek treatment for her neck pain (Tr. at 49-50).

Plaintiff cannot lift anything that is too heavy (less than five pounds), she drops her coffee cup sometimes, and sometimes she has to lift her right arm up with her left hand (Tr. at 35-36). No doctor has ever talked to plaintiff about limiting the amount of weight she lifts (Tr. at 43). Plaintiff can sit about ten minutes before her pain becomes "really unbearable" (Tr. at 36). She has to keep repositioning herself and she squirms a lot (Tr. at 36). She can walk for maybe ten minutes at a time (Tr. at 37).

Plaintiff does not have a driver's license -- it was suspended in January 2007 due to drinking and driving (Tr. at 32). She leaves her house about once a week to see her children

13

or go to the doctor (Tr. at 39). Plaintiff's boy friend does the grocery shopping (Tr. at 39). Although plaintiff can pop something in the microwave, her boy friend does the cooking (Tr. at 40). Plaintiff's boy friend does the laundry (Tr. at 40). Plaintiff is not able to sweep or vacuum (Tr. at 40). Plaintiff's boy friend takes the trash out (Tr. at 40-41). Plaintiff described an average day as follows: "Sitting, standing -- and then I go [lie] down about three times a day -- and take -- try to [lie] down about an hour each time." (Tr. at 41). Plaintiff gets about six hours of sleep each night, and she tries to nap during the day (Tr. at 41). Although plaintiff is still in pain while lying down, she puts a round pillow under her neck which helps some (Tr. at 42).

Plaintiff used to bowl, but she is unable to do that anymore (Tr. at 42). She used to enjoy dancing but can no longer do that either (Tr. at 42).

Plaintiff takes a lot of medication (Tr. at 32). She may experience a little dizziness as a side effect, but nothing else (Tr. at 32). She believes that is from her metformin which she began taking about a year before the hearing (Tr. at 32-33).

2.    **Vocational expert testimony.**

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge. None of plaintiff's past work amounted to substantial gainful activity (Tr. at 45-46).

The first hypothetical involved a person who could do medium work but should avoid climbing or exposure to significant unprotected heights, potentially dangerous and/or unguarded moving machine, commercial driving, uneven surfaces, extreme vibration, and would need a climate-controlled work environment to avoid extremes of cold and humidity (Tr. at 46-47). The vocational expert testified that such a person could be a child monitor, DOT 301.677-010, with 197,000 jobs in the country and 4,700 in Missouri (Tr. at 47). The person could also be a stocker, DOT 222.387-058, with 54,000 jobs in the country, and 1,200 in Missouri (Tr. at 47).

The next hypothetical was the same as the first except the person was unable to lift more than ten pounds occasionally and five pounds frequently with her dominant arm (Tr. at 49). The vocational expert testified that such a restriction would eliminate all medium exertional work (Tr. at 49).

## V.   FINDINGS OF THE ALJ

Administrative Law Judge Linda Carter entered her opinion on December 2, 2010 (Tr. at 12-20).

Step one. Plaintiff did not engage in substantial gainful activity from her alleged onset date (December 15, 2007) through her last insured date (December 31, 2007) (Tr. at 14).

Step two. Plaintiff has the following medically determinable impairments: myelomalacia of the spinal cord and osteophytes of the cervical spine (Tr. at 14). However, these impairments are not severe because they do not significantly limit plaintiff's ability to perform basic work-related activities for 12 consecutive months (Tr. at 14). Therefore, since plaintiff does not have a severe impairment, she was found not disabled at step two of the sequential analysis (Tr. at 17).

Step three. Alternatively, the ALJ assumed the plaintiff's myelomalacia and osteophytes of the cervical spine were severe impairments, but that her hypertension, hyperlipidemia, and right elbow mass were still nonsevere (Tr. at 17). Her severe impairments would not meet or equal a listed impairment (Tr. at 17-18).

Step four. Plaintiff retained the residual functional capacity to perform the full range of work at all exertional levels but with the following nonexertional limitations: She would have needed to avoid climbing of or exposure to significant unprotected heights, potentially dangerous and/or unguarded moving machinery, and commercial driving; she would have needed an even surface upon which to stand and walk; she would have needed to avoid extreme exposure to vibration; and she would have required a climate-controlled

15

environment to avoid extremes of cold and humidity (Tr. at 18). Plaintiff has no past relevant work (Tr. at 19).

Step five. If plaintiff's impairments were severe prior to her last insured date, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed (Tr. at 19). Plaintiff could have worked as a child monitor, with 4,700 positions in Missouri and 197,000 in the country, or stock clerk, with 1,200 positions in Missouri and 54,000 in the country (Tr. at 19). Therefore, alternatively, even if plaintiff's impairments were severe, there is work available she could have performed (Tr. at 20).

## VI.   *SEVERE IMPAIRMENT*

Plaintiff argues that the ALJ erred in finding the plaintiff's impairment of myelomalacia of the spinal cord and osteophytes of the cervical spine are non-severe impairments.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

> (a)   Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

> (b)   Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

>> (1)   Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

>> (2)   Capacities for seeing, hearing, and speaking;

>> (3)   Understanding, carrying out, and remembering simple instructions;

>> (4)   Use of judgment;

16

(5)     Responding appropriately to supervision, co-workers and usual work situations; and

(6)     Dealing with changes in a routine work setting.

Plaintiff bears the burden of establishing that an alleged impairment is severe. Caviness v. Massanari, 250 F.3d 603, 604-605 (8th Cir. 2001). While severity is not an onerous requirement, it is not a "toothless standard," and claimants must show more than minimal interference with basic work activities. Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007). To be considered severe, the impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. . . and must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1508).

The ALJ's analysis at the second step of the sequential evaluation included the following:

> The claimant has alleged an inability to work since December 2006. According to the claimant, she has experienced ongoing pain, particularly in her neck, back, right hip, hands, and arms. She allegedly is only able to lift 5 pounds, sit 10 minutes, and stand or walk 10 minutes. She also has to lie down three times per day for an hour each time due to pain. The claimant further testified that she has experienced a painful right elbow mass; she has pain in her hands and wrists; and due to weakness, at times she has to lift her right arm with her left.

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with a finding that the claimant has no severe impairment or combination of impairments for the reasons explained below.

> The record does document the claimant as having a motor vehicle accident in April 2005, for which she did not seek emergent care. She later reported some cervical pain stemming from her motor vehicle accident and imaging did reveal cervical spine osteophytes as well as some myelomalacia in her spinal cord. However, she did not seek ongoing regular treatment for such. Although she has indicated some financial difficulties in obtaining regular treatment, the undersigned notes that the claimant was able to maintain a long-term habit of smoking one pack of cigarettes per day. There is

17

also no evidence that she fully availed herself of available resources prior to her date last insured, including medical assistance, free clinics, or emergent care. Regardless, even when she has sought treatment, the record is devoid of any evidence showing a significant degree of muscle atrophy, muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or significantly reduced range of motion of the spine or joints, particularly prior to her date last insured, but even thereafter. Additionally, the claimant did not report to providers as significant a level of symptoms or limitations as she has alleged herein, either before her date last insured or after. In particular, there are no documented reports of the need to lie down due to pain multiple times per day nor are there ongoing reports of difficulties dropping items or an inability to dress herself at times. The claimant has also not been prescribed pain modalities such as a neck brace or an assistive device for ambulation, and she has never been referred by a physician to a pain management clinic notwithstanding her allegations of debilitating pain. Furthermore, she has not required ongoing pain medications allegedly because he does not like to take pain medications. She has also not required aggressive medical treatment, frequent hospital confinement, or surgical intervention to address her alleged pain symptoms.

The record also documents diagnoses of hypertension, hyperlipidemia, and a right elbow mass. However, the record does not document significant symptoms nor has the claimant undergone aggressive or extraordinary treatment for any of these conditions. In fact, most of these conditions are rarely mentioned throughout her medical [history], particularly prior to her date last insured. The claimant has also not alleged significant symptoms or limitations stemming from these conditions. Although she has indicated some pain associated with her right elbow mass, the claimant testified that this has been more recent as it did not cause pain previously. For these reasons, these impairments, considered singly and in combination, do not cause more than a minimal limitation in the claimant's ability to perform basic work activities and are therefore nonsevere.

In May 2010, James Rice, M.D., a completed a Medical Source Statement - Physical in which he assessed the claimant with limitations that would preclude her from completing a normal 8-hour workday. The undersigned acknowledges that a treating physician's medical opinion of the nature and severity of a claimant's impairment may be given great weight if it is well supported and not inconsistent with other substantial evidence in the case record. However, it may be discounted if it is inconsistent with the evidence and record as a whole, and is unsupported by the evidence. Dr. Rice's opinions are not supported by any treatment notes or by the results of clinical or diagnostic testing and are inconsistent with the evidence as a whole. Dr. Rice has not submitted any reports that would reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact as limited as he has indicated in his Medical Source Statement, and the doctor did not specifically address this weakness. Furthermore, Dr. Rice indicated that the claimant has had the same limitations since December 31, 2007, yet there is no indication that Dr. Rice treated the claimant in 2006 or 2007 nor is there evidence that he reviewed other medical evidence . . . prior to completing the Medical Source Statement. The record does document an abnormal stress test in late 2009 but the claimant's ejection fraction at 60% was normal; the plan was to treat her cardiac condition medically. Further, according to the treatment records from the date the Medical Source Statement was

completed, the claimant was actually treated by physician's assistant Josh Borgstadt and was seen for the explicit reason of completing disability paperwork on the date of the statement. For all of these reasons, no weight has been given to Dr. Rice's medical source statement.

Considering the record as a whole, the undersigned concludes that the claimant's subjective complaints and alleged limitations precluding employment are not fully persuasive. In addition to the medical evidence of record, the claimant allegedly engages in extremely limited daily activities, yet she has not reported such to her providers. Moreover, the claimant is residing with her boyfriend who handles most of the chores, cooking, and shopping; therefore, there is no indication that the claimant is unable to perform these activities, rather, she has not had to. As for the claimant's past work, the record shows that she had worked only sporadically with no substantial earnings prior to the alleged disability onset date. All of the issues discussed above raise a question as to whether the claimant's continuing unemployment is actually due to medical impairments and draws into question the claimant's credibility as a witness herein. The overall evidence of record supports that the claimant did not have a severe impairment prior to her date last insured.

(Tr. at 15-17).

Although plaintiff takes issue with the ALJ's relying on the lack of medical care during the relevant time, in her brief plaintiff cites only to medical records that either predate her alleged onset date or postdate her last insured date. As shown above, plaintiff went to the doctor only one time during the relevant time period:

On April 13, 2007, seven months after her last medical appointment, plaintiff went to Doctor's Hospital for a follow up and for medication refills. She continued to smoke one pack of cigarettes per day. She denied chest pain, shortness of breath, any respiratory symptoms or any gastrointestinal symptoms. Her mental and physical exams were normal except for the mass on her right elbow. She was assessed with hypertension, hyperlipidemia, and right elbow mass. She was told to keep taking her blood pressure medicine and add an aspirin a day.

Plaintiff did not complain of neck pain, back pain, wrist pain, hand pain, numbness, or dizziness; she did not mention a need to lie down, instances of dropping things, or the need to lift one arm with the other due to the inability of her dominant arm to function; she specifically denied chest pain and shortness of breath. Her exam was normal and she was continued on her same medications, none of which were for treatment of pain, numbness,

fatigue, insomnia, or any other condition or symptom related to her allegedly disabling impairments.

Plaintiff's allegation that she did not take pain medication because she is personally against it is completely implausible. In April 2005, plaintiff was prescribed a narcotic pain reliever after her car accident. There is nothing in that medical record indicating that plaintiff had any problem with using pain medication. In April 2008 she was prescribed a narcotic pain medication after she complained of neck pain. Again, there is nothing in that medical record indicating that plaintiff had any problem with using pain medication. Those two prescriptions were given either before plaintiff's alleged onset date or after her last insured date. In none of the other medical records is there any recommendation that plaintiff take medication that she did not care to take with the exception of Chantix, a medication to assist in smoking cessation. The lack of records showing that her medical providers recommended plaintiff take pain medication suggests only one thing -- none of them believed it was needed. Plaintiff did not complain of pain, she specifically denied pain, and for the most part she was treated for high blood pressure and high cholesterol, not for pain. Her testimony that her neck pain was a 9 out of 10 in severity is not credible. Her testimony that her hand and wrist pain is an 8 out of 10 is not credible.

Plaintiff argues that the ALJ failed to acknowledge that plaintiff's MRI showed not only myelomalacia of the spinal cord and osteophytes of the cervical spine, but also impingement on the thecal sac and impingement upon the anterior margin of the spinal canal at C5-6, spinal cord deformity and spinal canal stenosis at C4-5, and impingement upon the posterior thecal sac in the posterior margin of the spinal cord from C4 to C6. Although the MRI did indeed show these conditions, the MRI was taken in April 2005 -- a year and a half before plaintiff's alleged onset date. This means that (1) plaintiff was admittedly not disabled for a year and a half despite having these conditions, and (2) plaintiff's conditions as shown on the

20

MRI caused no limitations in FUNCTION, as plaintiff did not complain to any doctor, nurse or physician's assistant of any difficulty sitting, standing, walking, reaching, lifting, remembering, holding onto things, etc., during the relevant time period. Merely having the condition is irrelevant if the condition does not somehow limit plaintiff's ability to perform basic work activities. Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 730-731 (8th Cir. 2003). In this case there is no evidence that plaintiff's spinal conditions as noted by the radiologist affected her ability to perform basic work activities.

Plaintiff argues that the ALJ improperly found plaintiff not credible and as a result relied on that improper finding in deciding that plaintiff does not suffer from a severe impairment. Plaintiff's argument is without merit. Plaintiff's employment history shows that she has never earned substantial gainful activity even during the decades before her alleged onset date, suggesting that she continues to be unemployed for a reason other than her impairments. Plaintiff testified that her daily activities do not include many household chores because her boy friend does them -- because "he's a good guy," not because plaintiff is unable. Her inability to drive is due to her license having been revoked for drinking and driving, not because any of her impairments would interfere with her ability to drive.

Plaintiff never reported to any doctor a need to lie down, nor did any doctor ever recommend that plaintiff lie down. On the contrary, plaintiff's treating doctors routinely told her to get regular exercise including walking. Plaintiff never told any doctor that she drops things or that her dominant arm sometimes will not work on its own. Plaintiff did not report to any doctor that she experiences pain while sitting, standing or walking. She did not tell any doctor that she had problems with lifting or dressing herself.

Plaintiff was not on any pain medication during the relevant time period. No doctor ever recommended that she take pain medication. No doctor ever recommended that she limit her activities in any way, rather they consistently encouraged her to get regular exercise.

21

Plaintiff never indicated any side effects to any doctor which would limit her physical or mental ability to perform basic work activity. Plaintiff's treatment did not change during the relevant period, indicating that her medications were controlling her symptoms (medications which treat only conditions that do not allegedly cause any pain or dysfunction).

The ALJ adequately addressed the factors addressed by Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), and Social Security Ruling 96-7p, and properly found plaintiff's testimony not credible.

Plaintiff argues that the ALJ improperly discounted plaintiff's difficulty obtaining treatment due to finances. However, the record indicates that plaintiff had health insurance during the relevant time period;[7] and even when plaintiff did go to the doctor, she did not complain of the disabling symptoms she now claims she had. She did not complain of neck pain, back pain, wrist pain, hip pain, numb hands or wrists, an inability to hold onto things, an inability to lift her arm, a need to lie down multiple times per day. She went to the doctor for flu shots, for cold symptoms, for follow-up visits on high cholesterol and high blood pressure. There is no reason to believe that if plaintiff were suffering from disabling pain and other disabling symptoms, she would fail to mention those symptoms to her doctor when she was able to scrape together the money for a medical appointment. A claimant's complaints of functional limitations are inconsistent with the failure to seek regular medical treatment for those symptoms. Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997); Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996). Plaintiff claims the ALJ improperly relied on the fact that plaintiff spent her money on cigarettes instead of medical care, but the Eighth Circuit has

---

[7]Although plaintiff testified that she had trouble finding providers who would take her insurance, the medical records do not support this allegation. There is no indication anywhere in the records that plaintiff tried to see any doctor or have any procedure but was unable to do so because of a problem with her insurance.

indicated that such a consideration is proper. <u>Riggins v. Apfel</u>, 177 F.3d 689, 693 (8th Cir. 1999).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's impairments were not severe because there is no evidence that plaintiff's impairments affected her ability to perform basic work activities.

## VII.   CONCLUSIONS

Plaintiff also argues that the ALJ's alternative finding at step five was improper because the residual functional capacity assessment was made without obtaining any opinion from a medical source and provided no exertional limitations. Because I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's impairments are not severe, plaintiff's arguments regarding the ALJ's alternative holding are irrelevant.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 22, 2013

23